# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

LEE ANN MAYHALL,    )
    )
    **Plaintiff,**    )
    )
v.    )    No. 3:25-CV-00410- KAC-DCP
    )
THE SALVATION ARMY,    )    JURY DEMANDED
    )
    **Defendant.**    )

---

## AMENDED COMPLAINT

---

Plaintiff Lee Ann Mayhall, by and through counsel, brings this action against her former employer, The Salvation Army (TSA), to remedy the harm caused to her by TSA's adverse actions against her in retaliation for her reporting potential child sexual abuse by another TSA employee. TSA's actions violated her rights protected by the National Defense Authorization Act (NDAA), 41 U.S.C. § 4712(a)(2)(G); Tennessee Public Protection Act (TPPA), Tenn. Code Ann. 50-1-304; and Tennessee common law. TSA violated the NDAA, TPPA, and Tennessee common law when it disciplined, failed to promote, and ultimately discharged Ms. Mayhall in retaliation for her reports of potentially illegal activities, including health and safety concerns, prompted by the alleged conduct of a fellow employee toward children receiving TSA services, which are funded by federal grants. TSA's adverse actions against Ms. Mayhall also constitute discrimination based on her age and gender in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 630; Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e; and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-401, when it disciplined, failed

to promote, and ultimately discharged Ms. Mayhall. Through this lawsuit, Ms. Mayhall seeks redress for the harm and losses she sustained due to these violations of her rights.

## PARTIES

1. Plaintiff Lee Ann Mayhall is a citizen and resident of Polk County, Florida. Ms. Mayhall was employed by TSA from June 29, 2019 until July 10, 2024. Ms. Mayhall was born in 1961.

2. Defendant TSA is a foreign nonprofit corporation. Its principal place of business is located at 1424 Northeast Expressway NE, Brookhaven, GA 30329-2018. It can be served with process through its registered agent, CT Corporation System, 300 Montvue Rd., Knoxville, TN 37919-5546.

3. TSA is an employer within the meaning of the TPPA, Tenn. Code Ann. 50-1-304; the THRA, Tenn. Code Ann. § 4-21-401; Tennessee common law; the ADEA, 29 U.S.C. § 630(b); and Title VII, 42 U.S.C. § 2000e(b).

4. TSA is a grantee within the meaning of the NDAA, 41 U.S.C. § 4712(a)(1).

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over all causes of action asserted in this Complaint and personal jurisdiction over the Defendant because TSA conducts business in Knox County, Tennessee and the events giving rise to Ms. Mayhall's claims occurred within the area governed by TSA's Knoxville Area Command located in Knox County, Tennessee.

6. Venue for this action is proper in this Court because the events giving rise to Ms. Mayhall's claims occurred within the area governed by TSA's Knoxville Area Command located in Knox County, Tennessee.

2

**CONDITIONS PRECEDENT**

7. Ms. Mayhall timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that TSA discriminated against her based on her age and gender in violation of the ADEA and Title VII and retaliated against her for engaging in protected activity.

8. The EEOC issued a Notice of Right to Sue on December 8, 2025. This Amended Complaint is timely filed within ninety days of receipt of that notice.

9. Ms. Mayhall filed a complaint with the Office of the Inspector General for the Department of Health and Human Services (OIG) on July 11, 2025, as required by the NDAA. More than 210 days have passed, and Ms. Mayhall's NDAA claim is ripe for filing in this Amended Complaint.

10. Ms. Mayhall has fully exhausted her administrative remedies with the EEOC and the OIG. All administrative conditions precedent to filing this lawsuit have been met.

**FACTUAL ALLEGATIONS**

11. Ms. Mayhall was employed by TSA as an Associate Planned Giving Director from June 29, 2019 until July 10, 2024.

12. In the fiscal year before TSA terminated her employment, she ranked number four out of thirty-two planned giving staff in the entire Southern Territory, achieving 578% of her production goal. During her tenure, she secured $22.4 million in planned gifts.

13. In addition to receiving funding through planned gifts, TSA receives federal grant funding through the Department of Health and Human Services (HHS), which is an executive agency.

3

14.     In each of her five years of employment with TSA, Ms. Mayhall received excellent performance reviews. In one such review, Ms. Mayhall's supervisor noted that she had "achieved more in the eastern region of [the] division than any other associate who [had] come before her, and probably who ever will."

15.     In addition to her work at TSA, Ms. Mayhall volunteered her time to participate in the TSA Maryville (Tennessee) Corps' Relatives Raising Kids Program, and also provided outings for four children enrolled in the program who were being raised by their great-grandmother.

16.     Ms. Mayhall was transparent about her involvement with the children. She took the children on outings only after the great-grandmother obtained a glowing reference from the Maryville Corps Officer, then Captain Kati Chase. It was only after Captain Chase and the great-grandmother both separately informed Ms. Mayhall that she was approved to take the children that she did so. Captain Chase did not mention any policy prohibiting such interactions with the children.

17.     Throughout her involvement with the children for the next two years, Ms. Mayhall shared photos and stories frequently with her supervisor, Corps officers, and TSA volunteers. They commended her and encouraged her volunteer ministry through this TSA program.

18.     For example, Captain Chase confirmed with the children's great-grandmother that Ms. Mayhall would be attending and taking the children home from the Corps' annual Christmas party at which a longstanding member of TSA's advisory board and a staff member were present.

19.     On another occasion, TSA Knoxville Area Command worked with Ms. Mayhall to obtain tickets for the children to attend the Weigel's Christmas event at the Knoxville Expo Center, with full knowledge that she would be transporting the children to the event. There was no mention of this being a violation of TSA policy.

4

20. In December 2022, Ms. Mayhall informed the new Maryville Corps Officer, a Lieutenant in TSA (hereinafter "Maryville Corps Lieutenant"), who had been transferred to the Maryville Corps from the Clarksville Corps in November 2022, that she planned to host these children for a Christmas party at her home. The Maryville Corps Lieutenant asked to attend the party, and Ms. Mayhall agreed. Other adults were also present at the party.

21. Months later, in June 2023, two of the children were registered to attend TSA's Camp Paradise Valley. The great-grandmother reported to Ms. Mayhall that the Lieutenant was planning to transport the children without other adult supervision to a common pick-up point in Sevierville, Tennessee, approximately thirty miles away.

22. Just prior to their departure to the camp, on June 9, 2023, the children's great-grandmother sent Ms. Mayhall a text message asking whether she was aware of the Maryville Corps Lieutenant's behavior during the Christmas party.

23. When Ms. Mayhall said she was not aware, the great grandmother informed Ms. Mayhall via text message that while the children were playing outside during the party, the Maryville Corps Lieutenant engaged in a game of "Magnet" with two of the children. That game entailed the Maryville Corps Lieutenant chasing the children and, when caught, the children had to hug him and press their bodies against him. These were the same children the Maryville Corps Lieutenant was planning to transport without other adult supervision.

24. Ms. Mayhall was stunned and very concerned when she learned this information because she had no idea such a thing had occurred.

25. Ms. Mayhall called her immediate supervisor, Kim Rutherford, the Divisional Director of Planned Giving, on June 11 to share her concern about this incident with the children in a good faith attempt to comply with Tennessee mandatory reporting laws.

5

26. Ms. Mayhall then followed this phone call with an email to Ms. Rutherford on June 12 citing the incident.

27. Ms. Rutherford said she would report it to her own supervisor, Ayron Corbitt, TSA's Kentucky-Tennessee Divisional Director of Development. Ms. Rutherford later confirmed to Ms. Mayhall that she had shared these concerns with Ms. Corbitt.

28. Therefore, Ms. Mayhall reported her concerns about the Maryville Corps Lieutenant allegedly abusing his authority and posing a substantial danger to public health and safety to the management officials with responsibility to investigate, discover, or address the alleged misconduct.

29. Ms. Mayhall, on June 14, called Ms. Rutherford to alert her to her concern that the Maryville Corps Lieutenant planned to transport the two children to Sevierville on June 26 without another adult present. Again, Ms. Rutherford promised to share this concern with her supervisor, Ayron Corbitt, and later confirmed to Ms. Mayhall that she did so.

30. TSA allowed the Maryville Corps Lieutenant — in disregard of the children's safety — to drive the boys from Maryville to Sevierville to catch the bus to Camp Paradise Valley with no other adult present. He then drove them back from Sevierville to Maryville on July 1 after the camp ended.

31. On July 12, Ms. Mayhall received an email from Divisional General Secretary Major Zach Bell stating that TSA would be investigating the report involving the two children. Ms. Mayhall responded to this email, directing it to Major Bell, stating that she would answer any questions he asked her and suggested that he confirm whether the Maryville Corps Lieutenant did or did not transport the children without the presence of another adult. He made no response, however, retaliation for her protected activity began almost immediately.

6

32.    A week later, on July 19, Ms. Mayhall was summoned to an investigation meeting at which she was interrogated by Major Bell, Jennifer Hegg (the Divisional Paralegal), and Dan Duncan (the Divisional Director of Christian Education and Safe from Harm).

33.    At that meeting, Ms. Mayhall was told that she had violated TSA's Fraternization policy and Safe from Harm policy when she communicated with the children and their great-grandmother in text messages, transported the children to events, and invited the children into her home without another adult present. Ms. Mayhall was told that she could be terminated for these violations.

34.    As further reprisal for reporting the Maryville Corps Lieutenant's conduct, on July 27, Ms. Mayhall received a letter from Major Bell stating that TSA had investigated the Maryville Corps Lieutenant's conduct involving the children as relayed by her, but "[a]fter a prompt and thorough investigation into the concern [raised by Ms. Mayhall], [TSA was] unable to conclude that any policy violation [had] occurred by [the Maryville Corps Lieutenant]."

35.    The July 27 letter went on to state that Major Bell found that Ms. Mayhall had violated several of TSA's policies, including violation of Tennessee law on mandatory reporting of suspected child abuse. But Ms. Mayhall had appropriately reported the Maryville Corps Lieutenant's alleged conduct with the children to her TSA supervisor, which resulted in TSA's internal investigation.

36.    It was TSA officials who did not report this alleged conduct to the state and knowingly continued to expose the children to potential harm by allowing a suspected perpetrator to transport the children unsupervised.

7

37. Thus, despite Ms. Mayhall's protected disclosures to her TSA leadership, TSA leadership failed to comply with Tennessee's mandatory reporting laws. *See* Tenn. Code Ann. §§ 37-1-403 and 37-1-605.

38. Ms. Mayhall also learned during this timeframe that the Maryville Corps Lieutenant had revealed to a TSA donor that he had an addiction to pornography and had been treated for that addiction.

39. Upon information and belief, TSA officers were aware of the Lieutenant's alleged addiction to pornography and treatment that occurred while he was employed by TSA.

40. Thereafter, TSA officially announced that the Maryville Corps Lieutenant had taken leave from TSA to participate in residential mental health treatment.

41. The July 27 letter also directed Ms. Mayhall to sign a statement agreeing to have no further contact with the children or their family members and that any retaliation on Ms. Mayhall's part toward anyone participating in the review would be cause for disciplinary action, up to and including dismissal.

42. TSA not only threatened Ms. Mayhall's job and prohibited her from having further contact with the children and their great-grandmother but also prohibited her from even telling them goodbye. This act of reprisal also undermined Ms. Mayhall's ability to learn from the family, with whom she had established a healthy and supportive relationship, how TSA had handled its investigation into this situation.

43. Upon information and belief, TSA was trying to cover up the Maryville Corps Lieutenant's alleged misconduct while subjecting Ms. Mayhall to punitive and unwarranted adverse actions in retaliation for her protected activity of reporting what she reasonably believed to be an abuse of authority and a serious public safety concern.

8

44. The conduct of both Ms. Mayhall and the Lieutenant was investigated, but the Lieutenant, a much younger male employee, was not disciplined for transporting the children without another adult present, while Ms. Mayhall was disciplined for the same conduct.

45. Additionally, at various times throughout her employment at TSA, Ms. Mayhall reported what she believed to be discriminatory treatment to her supervisor, Ms. Rutherford. For example, Ms. Mayhall complained to Ms. Rutherford that she was punished unfairly over the incident in which she reported the alleged conduct of the Maryville Corps Lieutenant, a younger male TSA employee, and that he was being treated better than Ms. Mayhall.

46. Ms. Mayhall also informed Ms. Rutherford at the time of TSA's hostile treatment toward her during the investigation of that incident that if TSA fired her, she would hire an attorney.

47. Ms. Mayhall frequently shared with Ms. Rutherford examples of what she viewed as gender discrimination that affected the morale of their team, including being called "girl" by the Territorial Planned Giving Director. These types of comments felt especially condescending in the context of the disparate treatment she experienced when she was disciplined and the younger male employee was not.

48. Ms. Rutherford also talked to Ms. Mayhall about discriminatory and disparate treatment that she believed she herself was experiencing from her supervisors compared to her male colleagues. When they discussed the disparate treatment, Ms. Rutherford cautioned Ms. Mayhall not to rock the boat because reporting grievances would result in retaliation.

49. On the Saturday of Thanksgiving weekend, November 25, 2023, Ms. Mayhall received a call from a tenant at a community center where she volunteered requesting bedding for three destitute people—two women and a disabled young man. One of the women had recently

been discharged from UT Medical Center after having part of her leg amputated. After she was discharged from the hospital, all three were sleeping in their car, and it was bitterly cold.

50.     Previously in her role with TSA, Ms. Mayhall had referred people in need of short-term housing to the local Corps officers (Captain Chase and her predecessor, Captain Diffley), who placed them in a local hotel. Ms. Mayhall had been encouraged to call these officers and was allowed to call their cell phones at any time.

51.     Ms. Mayhall sent a text message to the Knoxville Area Commander, Major Cameron Henderson, who had assumed the role of acting head of the Maryville Corps in the absence of the Maryville Corps Lieutenant who had taken leave to participate in mental health treatment.

52.     Major Henderson responded that he was not convinced that these individuals were homeless and encouraged Ms. Mayhall to refer them to Knoxville Area Command on Monday.

53.     On November 28, 2023, Ms. Corbitt scheduled a TEAMS meeting with Ms. Mayhall to reprimand her for reaching out to an officer on a holiday weekend. She did not cite any policy violation but merely stated that TSA officers were overworked, and it was impermissible to contact them during non-business hours and on holidays.

54.     Ms. Mayhall explained that she would, of course, abide by this directive, but that she had never been told not to contact officers outside of business hours and had in fact been commended in the past by officers for doing so.

55.     Despite Ms. Mayhall's assurance that she would not contact an officer outside business hours, Ms. Corbitt stated in her written post-reprimand report that she "observed at the time [of the TEAMS meeting], this situation would probably repeat itself." This false and unwarranted "observation" along with the hostile and unreasonable reaction to Ms. Mayhall's

admirable efforts to assist those in need demonstrate that Ms. Corbitt and Major Henderson were discriminating against Ms. Mayhall and looking for reasons to discipline or discharge her in retaliation for her protected activities, including reporting the potentially illegal misconduct of the Maryville Corps Lieutenant.

56. When Ms. Rutherford announced that she was resigning from her position at TSA at the end of November 2023, she encouraged Ms. Mayhall to apply for the position because Ms. Mayhall was highly qualified for the job.

57. Ms. Corbitt, however, persistently encouraged Angela Moderow, Ms. Mayhall's much younger and much less experienced counterpart in West Tennessee, to apply for Ms. Rutherford's position.

58. When Ms. Moderow did not apply to the open posting, not once but twice, Ms. Corbitt took her aside in person and urged her to apply.

59. On January 17, 2024, Ms. Corbitt called to tell Ms. Mayhall that Ms. Moderow, a much younger woman who was demonstrably and objectively far less qualified than Ms. Mayhall, had been selected for the position. Ms. Corbitt gave Ms. Mayhall a vague and pretextual explanation about Ms. Moderow having a better "strategy" for the Planned Giving team. She was not willing to share the strategy when Ms. Mayhall asked.

60. TSA's failure to articulate a legitimate explanation for its decision, and its efforts to bend over backwards to promote a younger, less qualified candidate is evidence of pretext to cover up its discrimination against Ms. Mayhall based on her age and in retaliation for her protected activities.

61. TSA's discriminatory and retaliatory adverse actions against Ms. Mayhall continued. Despite Ms. Mayhall's proven history of exceptional fundraising and outstanding

11

performance, Ms. Corbitt continued to subject her to excessive scrutiny to find a reason to discharge her based on her age, gender, and in retaliation for her protected activities.

62. On July 5, 2024, Ms. Moderow called Ms. Mayhall to tell her that Ms. Corbitt wanted to have a TEAMS meeting that following Monday, July 8. Ms. Moderow told Ms. Mayhall there was nothing to worry about.

63. On the TEAMS call, however, Ms. Corbitt told Ms. Mayhall she was being suspended without pay beginning that day.

64. Ms. Corbitt falsely asserted that Ms. Mayhall had engaged in misconduct when she called the nephew of a deceased donor three times. Ms. Moderow clarified to Ms. Corbitt that Ms. Mayhall had called only once. Ms. Corbitt said she would correct her mistake about the number of calls with the Finance Board who would be considering proposed discipline for Ms. Mayhall.

65. Ms. Corbitt then said Ms. Mayhall had called the nephew without permission. This accusation was also false, yet when Ms. Mayhall replied that Ms. Moderow remembered Ms. Mayhall asking permission to call the nephew, Ms. Moderow confirmed only that she remembered Ms. Mayhall asking "a question" but could not recall the details of the question.

66. At that point in the July 8 meeting, Ms. Corbitt said that Ms. Mayhall had engaged in a "pattern of policy violations." Ms. Corbitt specifically referred to the incident in which Ms. Mayhall reported information about the Maryville Corps Lieutenant's interactions with the young boys resulting in TSA's retaliatory accusation that Ms. Mayhall violated policy.

67. Ms. Corbitt then cited the weekend when Ms. Mayhall contacted an officer outside of business hours. Ms. Mayhall pointed out that she had not been informed of any policy violations related to that event, let alone demonstrated a "pattern" of repeated violations of the same policy.

12

68. Ms. Mayhall told Ms. Corbitt that she was being disciplined for reporting the Maryville Corps Lieutenant's alleged misconduct when others were not disciplined for engaging in actual misconduct, including the Maryville Corps Lieutenant, who was still employed. Ms. Corbitt at that point went silent.

69. Ms. Mayhall pointed out that she had done everything she was directed to do after TSA disciplined her for reporting the Maryville Corps Lieutenant's alleged misconduct and for contacting an officer outside of business hours. Ms. Corbitt replied that TSA's Finance Board would meet the following day to decide whether Ms. Mayhall would be terminated.

70. Ms. Mayhall prepared a written response and submitted it to Ms. Corbitt and Major Philip Canning before the beginning of the Finance Board meeting. Major Canning had succeeded Major Zach Bell as Divisional General Secretary and had only been on the job for a few days, as had the new Divisional Commander.

71. Without regard for Ms. Mayhall's response, and with no further discussion, she was summarily fired in a letter from Major Canning the following day.

72. Specifically, on July 10, 2024, TSA terminated Ms. Mayhall's employment, falsely stating that she had engaged in a "pattern of policy violations."

73. The reasons stated by TSA for terminating Ms. Mayhall's employment are false and a pretext to cover up its motivation to discharge her in retaliation for her protected disclosures to TSA management.

74. TSA engaged in retaliation against Ms. Mayhall for her protected activity of reporting what she reasonably believed to be a serious public safety concern and potential abuse by an authority figure.

13

75. TSA's adverse actions against Ms. Mayhall also constitute discrimination based on age and gender and retaliation for her protected activity of complaining about discrimination.

76. In contrast to the way TSA treated Ms. Mayhall, it sought to cover up alleged misconduct of the much younger male Maryville Corps Lieutenant, and in fact, upon information and belief promoted him to Captain. TSA disciplined Ms. Mayhall while simultaneously finding that the Lieutenant had not violated its policies, including for transporting children without another adult present.

77. The reasons stated by TSA for disciplining Ms. Mayhall, denying her a promotion, and discharging her are a pretext to cover up retaliation and discrimination based on her age and/or gender.

78. TSA engaged in discrimination and retaliatory adverse actions when it subjected Ms. Mayhall to excessive scrutiny, unwarranted discipline, failure to promote her to a position for which she was indisputably more qualified than the much younger inexperienced candidate, and other punitive and unwarranted adverse actions, including discharge.

79. TSA sought to cover up its discriminatory and retaliatory motives toward Ms. Mayhall by cobbling together baseless accusations of misdeeds to try to justify its unwarranted decisions to discipline and discharge her.

80. TSA's discriminatory and retaliatory treatment and callous dismissal of Ms. Mayhall continues to cause her humiliation, serious emotional distress, and substantial economic losses, including lost earnings, benefits, expenses, and attorneys' fees.

81. TSA's actions against Ms. Mayhall described herein were carried out willfully, intentionally, maliciously, and/or with reckless indifference to her rights under the law.

14

## CAUSES OF ACTION

### Count 1: Violation of the NDAA

82. Ms. Mayhall re-alleges and incorporates the previous paragraphs.

83. Ms. Mayhall was an employee of TSA.

84. TSA is a grantee within the meaning of the NDAA, 41 U.S.C. § 4705(a)(2).

85. Ms. Mayhall disclosed what she reasonably believed to be a substantial and specific danger to public health or safety, specifically concerns pertaining to potential child sexual abuse, to a management official of TSA who had the responsibility to investigate, discover, or address the misconduct. 41 U.S.C. § 4712(1)-(2)(G).

86. TSA terminated Ms. Mayhall's employment in retaliation for this protected conduct.

### Count 2: Violation of TPPA

87. Ms. Mayhall re-alleges and incorporates the preceding paragraphs.

88. Ms. Mayhall was an employee of TSA.

89. Ms. Mayhall refused to participate in or remain silent about illegal activity as defined in Tenn. Code Ann. § 50-1-304.

90. Specifically, Ms. Mayhall refused to remain silent about the conduct of the Maryville Corps Lieutenant, which potentially constituted child sexual abuse, and therefore implicated important public policy concerns. *See* Tenn. Code Ann. §§ 39-13-504 and 505.

91. Her protected activity of reporting this conduct to her superiors at TSA was also an effort to comply with state mandatory reporting requirements. *See* Tenn. Code Ann. §§ 37-1-403 and 37-1-605.

15

92. TSA ultimately terminated Ms. Mayhall's employment solely for her refusal to participate in or remain silent about illegal activity.

**Count 3: Common Law Retaliatory Discharge**

93. Ms. Mayhall re-alleges and incorporates the preceding paragraphs.

94. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Ms. Mayhall alleges, in the alternative, that TSA violated Tennessee common law when it terminated her employment.

95. Ms. Mayhall was an employee of TSA and was discharged from that employment.

96. Ms. Mayhall engaged in protected activity by reporting conduct by a TSA officer that potentially posed potential safety and health risks to children and the public, in violation of clear public policy as evidenced by Tenn. Code Ann. §§ 39-13-504 and 505. Her protected activity of reporting this conduct was also an effort to comply with state mandatory reporting requirements contained in Tenn. Code Ann. §§ 37-1-403 and 37-1-605.

97. Ms. Mayhall's exercise of protected rights and compliance with clear public policy evidenced by unambiguous statutory provisions was a substantial factor in TSA's decision to terminate her employment. *See Smith v. Bluecross Blueshield of Hamilton Cnty.*, 710 S.W.3d 686, 693-94 (Tenn. 2025) (acknowledging the existence and listing the elements of common law action for retaliatory discharge); *Williams v. City of Burns*, 465 S.W.3d 96, 110 n.1 (Tenn. 2015) (recognizing the continued viability of common law retaliatory discharge claim under certain circumstances, such as the reporting of illegal professional conduct); *Crews v. Buckman Labys. Int'l*, 78 S.W.3d 852, 862 (Tenn. 2002).

98. In retaliation for Ms. Mayhall's protected activities, TSA subjected her to excessive scrutiny and unwarranted discipline, then fired her for baseless and pretextual reasons.

**Count 4: Age Discrimination in Violation of the ADEA and THRA**

99. Ms. Mayhall re-alleges and incorporates the preceding paragraphs.

100. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Ms. Mayhall alleges, in the alternative, that TSA violated the ADEA and the THRA.

101. TSA treated Ms. Mayhall worse than her similarly situated younger peers, including disciplining her, passing her over for a promotion, and ultimately terminating her employment on the basis of age in violation of the ADEA and the THRA.

**Count 5: Gender Discrimination in Violation of Title VII and the THRA**

102. Ms. Mayhall re-alleges and incorporates the preceding paragraphs.

103. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Ms. Mayhall alleges, in the alternative, that TSA violated Title VII and the THRA.

104. TSA treated Ms. Mayhall worse than her similarly situated male peers and then terminated her employment on the basis of sex in violation of Title VII and the THRA.

**Count 6: Retaliation in violation of the ADEA, Title VII, and the THRA**

105. Ms. Mayhall re-alleges and incorporates the preceding paragraphs.

106. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Ms. Mayhall alleges, in the alternative, that TSA engaged in retaliation in violation of the ADEA, Title VII, and the THRA.

107. Ms. Mayhall engaged in protected activity when she complained about discriminatory treatment in the workplace, opposed unlawful employment practices, and/or participated in an investigation or proceeding into such practices made unlawful by Title VII and/or the ADEA, and/or the THRA.

108. TSA retaliated or condoned retaliation against Ms. Mayhall in violation of the ADEA and/or Title VII and/or the THRA when it subjected Ms. Mayhall to excessive scrutiny,

17

unwarranted discipline, failure to promote her to a position for which she was indisputably more qualified than the much younger inexperienced, under-performing candidate, and other punitive and unwarranted adverse actions, including discharge.

109.     TSA's actions against Ms. Mayhall would dissuade a reasonable employee from reporting or complaining about unlawful discrimination.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Mayhall request that the Cout grant her the following relief:

A.     Enter judgment for Ms. Mayhall against TSA; declare that TSA's actions violated the NDAA, the TPPA, and/or the common law of Tennessee, the ADEA, Title VII, and the THRA; and enjoin TSA from further unlawful discriminatory and retaliatory policies and practices.

B.     Order TSA to make Ms. Mayhall whole by providing appropriate backpay with prejudgment interest, in an amount to be determined at trial, and other affirmative relief necessary to eradicate the effects of TSA's unlawful employment practices, including an appropriate amount to offset increased tax consequences of any lump sum payment.

C.     Order TSA to pay Ms. Mayhall her front pay and the value of future lost benefits or, in the alternative, order that Ms. Mayhall be reinstated to an appropriate position with TSA.

D.     Order TSA to pay Ms. Mayhall compensatory damages in an amount to be determined by a jury.

E.     Order TSA to pay Ms. Mayhall punitive damages in an amount to be determined by a jury.

F.      Order TSA to pay all costs, disbursements, pre-judgment interest, post-judgment interest, expert witness fees, and reasonable attorneys' fees as allowed by law.

G.      Award Ms. Mayhall the costs of bringing this action.

H.      Grant such further relief as the Court deems just, proper, and equitable.

## JURY TRIAL DEMAND

Ms. Mayhall requests a jury trial on all questions of fact raised by her Amended Complaint.

Respectfully submitted this 10th day of April 2026.

/s/ *Summer H. McMillan*

Summer H. McMillan, BPR #020296
Jennifer B. Morton, BPR #015585
Cheyenne E. Peters, BPR # 043189
JENNIFER MORTON LAW, PLLC
8217 Pickens Gap Road
Knoxville, TN 37920
(865) 579-0708 (phone)
(865) 579-0787 (fax)
summer@jmortonlaw.com
jen@jmortonlaw.com

*Counsel for Lee Ann Mayhall*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 10, 2026, the foregoing Amended Complaint was filed electronically using the Court's ECF filing system. Notice of the filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties have access to these filings through the Cout's ECF system.

<u>/s/ *Jennifer B. Morton*</u>

20